Under MARPOL, the discharge of oily mixtures from the machinery spaces of an oil tanker is prohibited unless the ship has in operation the required pollution control equipment. MARPOL, Annex I, Regulation 9(4). "Exceptional" discharges of oily mixtures must be recorded in the Oil Record Book. 33 C.F.R. § 151.25(g). Regulation 20 of MARPOL and 33 C.F.R. § 151.25(g) require that discharges other than those authorized must be recorded in the Oil Record Book. As stated above, the regulations require an entry to be made when the oil discharge monitoring and control system fails. *See* MARPOL, Annex I, Appendix III(F).

Conclusion

Accordingly, based upon the legal analysis and discussion set forth herein, the undersigned United States Magistrate recommends that the District Court deny *Defendant Jho's Motion to Dismiss* [Clerk's doc. # 18-1] and *Supplemental Motion to Dismiss* [Clerk's doc. # 63].

Objections

Pursuant to 28 U.S.C. § 636(b)(1)(c), all parties are entitled to serve and file written objections to the report and recommendation of the magistrate judge within ten (10) days of receipt of this report. Failure to file specific, written objections to the proposed findings of facts, conclusions of law and recommendations contained within this report within ten (10) days after service shall bar an aggrieved party from *de novo* review by the District Judge of the proposed findings, conclusions and recommendations, and from appellate review of factual findings and legal conclusions accepted by the District Court except on grounds of plain error. *See Thomas v. Arn,* 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Douglass v. United Serv. Auto. Ass'n.,* 79 F.3d 1415 (5th Cir.1996) (*en banc* ); 28 U.S.C. § 636(b)(1). The constitutional safeguards afforded by Congress and the courts require that, when a party takes advantage of his right to object to a magistrate's findings or recommendation, a district judge must exercise its nondelegable authority by considering the actual evidence and not merely by reviewing and blindly adopting the magistrate's report and recommendation. *See Hernandez v. Estelle,* 711 F.2d 619, 620 (5th Cir.1983); *United States v. Elsoffer,* 644 F.2d 357, 359 (5th Cir.1981) (per curiam).

REPORT AND RECOMMENDATION ON DEFENDANT OVERSEAS SHIPHOLDING GROUP, INC.'S MOTION TO DISMISS

*24 Pursuant to 28 U.S.C. § 636(b) and the Local Rules for the United States District Court for the Eastern District of Texas, the District Court referred this criminal matter to the undersigned United States Magistrate for hearing and submission of findings of fact and a report and recommendation on certain case-dispositive motions. *See Order of Referral* [Clerk's doc. # 70]. Pending before the Court for purposes of this report is *Defendant Overseas Shipholding Group, Inc's Motion to Dismiss Second Superseding Indictment* [Clerk's doc. # 59].

Background [FN1]

Defendant Kun Yun Jho (hereinafter referred to as "Jho") was employed as the Chief Engineer of the *M/T Pacific Ruby.* The *M/T Pacific Ruby* is an ocean-going petroleum oil tanker owned and operated by Defendant Overseas Shipholding Group, Inc. (OSG), which is a New York corporation. The *Pacific Ruby* is registered in the Marshall Islands.

As Chief Engineer, Jho has the overall responsibility for the operations in the engine room of the *Pacific Ruby,* including the responsibility for operating the vessel's anti-pollution equipment and entering information concerning that equipment into a log book (Oil Record Book) which is regularly inspected by the United States Coast Guard. Engine room operations in large marine vessels such as the *Pacific Ruby* generate large quantities of oil-contaminated bilge waste when oil drips from the engine's fuel and lubrication systems and mixes with water in the bottom of the vessel. These "oily mixtures" are also referred to as "bilge slops" or "slops from bilges". The oily mixtures are collected and processed through an Oily Water Separator whereby the water is separated from the oil and other wastes. The mixture is then passed through an oil-sensing device known as an Oil Content Meter. If the Oil Content Meter determines that the oil content of the effluent exceeds fifteen parts per million (15 ppm), alarms sound, and the effluent is automatically directed to a storage tank on the vessel. If the Oil Content Meter determines that the oil content in the effluent is 15 ppm or less, the effluent is discharged overboard.

Apparently, the Oil Content Meter can be "tricked" into erroneously "believing" that the effluent contains 15 ppm or less oil by flushing it with fresh water to skew the oil content reading. Also, the system can apparently be "tricked" by inserting tools or other objects into valves or other pieces of equipment to cause an oily mixture containing oil of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

15 ppm or more to be discharged overboard rather than be properly directed to the appropriate storage tank. In response to this, some vessels have "anti-tricking" devices installed to thwart "tricking" of the anti-pollution equipment.

a). *Charges Pending Against OSG and Jho Under the Second Superseding Indictment*

A federal grand jury returned a Second Superseding Indictment [Clerk's doc. # 46] against Jho and OSG on August 16, 2006. Count 1 of the Second Superseding Indictment charges that OSG and its employee and co-defendant Jho conspired to: (1) make false and use false writings in a matter within the jurisdiction of the U.S. Coast Guard and the Department of Homeland Security; (2) fail to maintain an Oil Record Book for the *Pacific Ruby;* and (3) alter, conceal, cover up, falsify, or make a false entry in a record or document with the intent to impede, obstruct, or influence the investigation and proper administration of a matter within the jurisdiction of the U.S. Coast Guard and Department of Homeland Security, all in violation of Title 18, United States Code, Section 371.

*25 The "manner and means" portion of the Second Superseding Indictment sets forth allegations of how Jho, OSG, and others intended to effectuate the conspiracy and further its objectives. The Second Superseding Indictment alleged that the defendants routinely discharged oily mixtures into the ocean with equipment and procedures that prevented the Oil Content Meter from operating as it was designed. It alleges that the defendants taught other individuals to "trick" the Oil Content Meter by flushing it with fresh water to prevent it from sensing an actual sample of the overboard discharge. Jho allegedly taught other members of the conspiracy how to defeat newly installed anti-tricking equipment which would have prevented the use of fresh water to trick the Oil Content Meter. Finally, Jho and OSG also allegedly maintained a false and misleading Oil Record Book and made and caused to be made materially false statements to members of the United States Coast Guard while the *Pacific Ruby* was in port.

The Second Superseding Indictment also sets forth overt acts of the defendants which furthered the conspiracy. The Government alleges that Jho and OSG maintained a false and misleading Oil Record Book on sixteen (16) different occasions while at ports in the Eastern District of Texas. They allege that Jho directed individuals to search for objects to defeat the anti-tricking devices and directed a subordinate to flush the Oil Content Meter with fresh water while creating a record which concealed the tampering. The Government contends that OSG continued to operate the *Pacific Ruby* in United States ports without procedures and precautions to confirm the proper operation of the anti-tricking equipment after learning that the logging device was not properly recording dates. Finally, it is alleged that, on two occasions, Jho and OSG caused the presentation of a false Oil Record Book to members of the United States Coast Guard which failed to record the discharges of oily mixtures.

Count 2 of the Second Superseding Indictment charges Jho and OSG with making false statements in violation of Title 18, United States Code, Sections 1001(a)(3) and 2. It alleges that Jho made and used a false and fictitious Oil Record Book that stated that a discharge had been made on September 11, 2005 "with 15 ppm equipped" which created the false impression, through false and misleading entries and omissions, that the vessel was operating properly when Jho knew that the Oil Content Meter was being flushed with fresh water and not sensing a true sample.

Counts 3 through 10 charge Jho and OSG with knowingly failing to maintain an Oil Record Book, by failing to disclose exceptional discharges in which oily mixtures, slops from bilges and bilge water that accumulated in machinery spaces had been made without the use of a properly functioning Oil Water Separator and Oil Content Meter and falsely indicating the proper use of required pollution prevention equipment on eight (8) different occasions, all in violation of Title 33, United States Code, Section 1908(a), Title 33 C.F.R., Section 151.25, and Title 18, United States Code, Section 2.

b). *Applicable Laws and Treaties*

*26 Before the Court are two key instruments setting forth the international legal and regulatory regime addressing the issues of marine pollution on the high seas. The first is the United Nations **Convention** on the **Law** of the **Sea**, 1982 (UNCLOS). The second includes the 1973 International Convention for the Prevention of Pollution from Ships and the Protocol of 1978 Relating to the International Convention for the Prevention of Pollution from Ships, collectively known as "MARPOL." *United States v. Abrogar,* 459 F.3d 430, 431-32 (3d Cir.2006); *see also* Shaun Gehan, Case Note, *United States v. Royal Caribbean*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Cruises, Ltd.: Use of Federal 'False Statements Act' to Extend Jurisdiction Over Polluting Incidents into Territorial Seas of Foreign States*, OCEAN & COASTAL L.J. 167, 169 (2002). UNCLOS has more the status of a "constitution of the oceans," whereas MARPOL sets out a detailed regulatory framework, specifically enforceable amongst the signatory states. Gehan, at 169. These treaties are not self-executing, but rather must be implemented by member states through legislation. *Id.* In the United States, Congress codified the provisions of MARPOL through the Act to Prevent Pollution from Ships (APPS), 33 U.S.C. § § 1901, *et seq.* APPS make it a crime for any person to knowingly violate the MARPOL Protocol, APPS, or regulations promulgated under APPS. *See* 33 U.S.C. § 1908(a).

Regulations for the prevention of pollution by oil from ships are set forth in Annex I to MARPOL. APPS also authorizes the Coast Guard to issue regulations implementing the requirements of these treaties. 33 U.S.C. §§ 1903, 1907. The Coast Guard utilized this authority in issuing detailed regulations. *See* 33 C.F.R. §§ 151.01, *et. seq.* Annex I sets out the standards for the maximum amount of oil permitted to be discharged from ships. *See United States v. Abrogar*, 459 F.3d 430, 431 (3rd Cir.2006). MARPOL also requires that ships have and maintain equipment to collect and measure the oil content of various waste and bilge discharges from ships and divert discharges which contain too much oil into storage tanks rather than discharging the liquid into the ocean. *Id.*

Vessels over a certain size (such as the *Pacific Ruby*) must maintain an Oil Record Book. 33 C.F.R. § 151.25(a). The Oil Record Book must contain entries which relate to the (1) transfer of oil; (2) management and disposal of oily wastes generated on board the vessel, including any discharges of dirty ballast or cleaning water from fuel oil tanks; and (3) the disposal of oily residue such as sludge, as well as discharges of bilge waste that has accumulated in machinery spaces. MARPOL Annex 1, Reg. 20(1); *Abrogar*, 459 F.3d at 432. The Oil Record Book must also contain a record of emergency, accidental, or other exceptional discharges and the circumstances or reasons therefore. 33 C.F.R. 151.25(g). Certain entries in the Oil Record Book must be signed by the person in charge of the operation. 33 C.F.R. 151.25(h). Finally, under Title 33, United States Code, Section 1908(a), a person who knowingly violates the MARPOL Protocol, that chapter, or the regulations issued thereunder, commits a class D felony.

Law of the Flag
*27 OSG argues that the Government cannot criminalize conduct that it cannot regulate directly. It argues that the "Law of the Flag," jurisdictional limitations within the APPS statute, and jurisdictional limitations of international law prohibit this prosecution.

The law of the flag is customary international law recognized by the courts of the United States and the world. *United States v. Royal Caribbean Cruises Ltd.*, 11 F.Supp.2d 155, 160 (D.P.R.1997). In *Lauritzen v. Larsen*, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953), the Supreme Court stated:

> "Perhaps the most venerable and universal rule of maritime law ... is that which gives cardinal importance to the law of the flag ... This Court has said that the law of the flag supersedes the territorial principle, even for purposes of criminal jurisdiction of personnel of a merchant ship because ... [the ship] "is deemed to be a part of the territory of the sovereignty [whose flag it flies], and not to lose that character when in navigable waters within the territorial limits of another sovereignty."

*Lauritzen v. Larsen*, 345 U.S. at 584-85, 73 S.Ct. 921, 97 L.Ed. 1254(quoting *United States v. Flores*, 289 U.S. 137, 155-59, 53 S.Ct. 580, 77 L.Ed. 1086 (1933)).

Under international law, all nations have an equal right to travel on the high seas. *United States v. Marino-Garcia*, 679 F.2d 1373, 1380 (11th Cir.1982), *cert. denied* 459 U.S. 1114, 103 S.Ct. 748, 74 L.Ed.2d 967 (1983) (internal citations omitted). To insure the principle of freedom of the seas, international law generally prohibits any country from asserting jurisdiction over foreign vessels on the high seas. *Id.* The so-called flag-state rule is so pervasive that under some circumstances the flag state's jurisdiction extends even into the territorial waters (12 mile limit) of another state. *See Benedict on Admiralty*, § 112a[4] (7th ed.2003) (citing *United States v. Flores*, 289 U.S. 137, 149-150, 53 S.Ct. 580, 582, 77 L.Ed. 1086 (1933). Thus, the flag state's jurisdiction should be allowed, as a matter of comity, to prevail over that of the territorial state, unless the peace and dignity of the country, or the tranquility of the port is threatened. *Id.* Citing *United States v. Rogers*, 150 U.S. 249, 14 S.Ct. 109, 37 L.Ed. 1071 (1893); *United States v. Reagan*, 453 F.2d 165 (6th Cir.1971), *cert. denied*, 406 U.S. 946, 92 S.Ct. 2049,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

32 L.Ed.2d 334 (1971).

However, a different result may occur if the criminal conduct occurs in port. It has been noted that the flag rule is derived from the territorial principle. *Id.* That a state may exercise jurisdiction with respect to all persons or things within its territory (the territorial principle) is a well-established principle of international law. *Benedict on Admiralty*, § 112a[3]. The Supreme Court first established the territorial principle in 1812 when Chief Justice Marshall declared that the jurisdiction of the nation within its own territory is necessarily exclusive and absolute. *See Schooner Exchange v. M'Faddon*, 7 Cranch 116, 11 U.S. 116, 136, 3 L.Ed. 287 (1812). The Supreme Court has also held that in the maritime context, when a merchant vessel enters the port of another, it subjects itself to the laws of that place unless by treaty or otherwise the two reach an alternate agreement. *Benedict, supra,* citing *Wildenhus' Case*, 120 U.S. 1, 7 S.Ct. 385, 30 L.Ed. 565 (1887) (the United States had jurisdiction over Belgian national who had killed countryman on board Belgian vessel moored at a New Jersey dock); *see also United States v. Diekelman*, 92 U.S. 520, 525, 23 L.Ed. 742 (1875) (according to the law of nations, "merchant vessels of one country visiting the ports of another ... subject themselves to the law which governs the port that they visit, so long as they remain").

*28 The crimes set forth in the Second Superseding Indictment each allege that they occurred, at least in part, in various ports within the Eastern District of Texas. The Government has unfettered jurisdiction to prosecute violations of its national laws that occur within its borders. *See, e.g. Nevada v. Hall*, 440 U.S. 410, 416, 99 S.Ct. 1182, 59 L.Ed.2d 416; *see also United States v. Royal Caribbean Cruises Ltd.*, 11 F.Supp 2d 1358, 1373 (S.D.Fla.1998). Accordingly, the Law of the Flag does not bar the prosecution of OSG in this case.

Transfer under MARPOL
OSG argues that, under Article 6(2) of MARPOL, the United States was required to report the record keeping violations to authorities in the flag state (the Marshall Islands) for appropriate action. Relatedly, OSG aruges that Article 4(2) of MARPOL provides for the exercise of jurisdiction by the port state only if the matter is "within the jurisdiction" of that state.

Article 6(2) of MARPOL allows officials of the port state (in this case, officers of the United States Coast Guard), to inspect the *Pacific Ruby* for the purpose of verifying whether the ship has discharged any harmful substances in violation of the provisions of the Regulations. MARPOL, Article 6(2). "If an inspection indicates a violation of the Convention, a report shall be forwarded to the Administration for any appropriate action." *Id.* The "Administration" is the flag state. MARPOL, Article 2(5). Therefore, under Article 6(2), any such report made by the Coast Guard in this instance should have been forwarded to the Marshall Islands.

However, Article 4(2) of MARPOL further provides:
(2) Any violation of the requirements of the present Convention *within the jurisdiction of any party* to the Convention shall be prohibited and sanctions shall be established therefore under the law of that Party. Whenever such a violation occurs, that Party shall either:
(a) cause proceedings to be taken in accordance with the law; *or*
(b) furnish to the Administration of the ship such information and evidence as may be in its possession that a violation has occurred.
MARPOL, Article 4(2)(emphasis added).

A close reading of Article 4(2) this statute indicates that, if the United States has jurisdiction over this matter, it can choose to bring the appropriate charges, or it can refer the case to the flag state. In other words, Article 4(2) provides for concurrent jurisdiction between the port state and the flag state. This Court is not alone in its interpretation of Article 4(2) and UNCLOS, as two district courts have reached the same conclusion. *See United States v. Royal Caribbean Cruises, Ltd.*, 24 F.Supp.2d 155, 160 (D.P.R.1997) ("A careful review of the MARPOL and UNCLOS treaties reveal the concurrent jurisdiction of this matter between the United States and Norway."); *United States v. Royal Caribbean Cruises, Ltd.*, 11 F.Supp.2d 1358, 1367-68 (S.D.Fla.1998).

*29 As stated above, the record keeping violations, as charged, were allegedly committed within the Eastern District of Texas at various ports. The United States has jurisdiction over offenses committed within its borders and has elected to assert that jurisdiction, rather than refer the matter to the flag state. This Court has no input in that decision.

United Nations Convention on the Law of the Sea
OSG contends that the United Nations Convention on the Law of the Sea (UNCLOS) permits only civil penalties for violations under APPS and MARPOL

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

committed by foreign flagged vessels, except for willful and serious acts of pollution committed in the territorial sea of the coastal state, citing Article 230, section 7. The Government answers that the United States is not a party to UNCLOS. The Government further argues that even if the United States were a party to UNCLOS, it does not constrain or limit a prosecution for crimes committed in port. [FN2] Finally, the Government contends that Article 230 does not apply to corporations.

Section 7 of part XII of the Law of the Sea Convention states:
> Monetary penalties only may be imposed with respect to violations of national laws and regulations or applicable international rules and standards for the prevention, reduction and control of pollution of the marine environment, committed by foreign vessels in territorial sea, except in the case of a willful and serious act of pollution in the territorial sea.

*Law of the Sea Convention,* Article 230.2. In resolving these issues, this Court once again looks to the analysis and reasoning set forth by the district courts in *United States v. Royal Caribbean Cruises, Ltd.,* 24 F.Supp.2d 155 (D.P.R.1997) and *United States v. Royal Caribbean Cruises, Ltd.,* 11 F.Supp.2d 1358 (S.D.Fla.1998).

Both district court cases involved Royal Caribbean Cruises, Ltd., (RCCL) as the corporate defendant. The Puerto Rico district court noted that although UNCLOS was currently pending ratification by the Senate, it nevertheless carried the weight of law from the date of its submission by the President to the Senate. 24 F.Supp.2d at 159 (Citing Article 19 of the Vienna Convention on the Law of Treaties). Finding UNCLOS to be applicable and finding no serious act of pollution, the district court held that the defendant could only be subjected to monetary penalties within the jurisdiction of the United States pursuant to Article 230.2. *Id.* at 160. However, the Puerto Rico district court denied RCCL's motion to dismiss, holding that the limitation of monetary penalties does not bar the United States from pursuing the charges in the indictment. *Id.* The district court held that "[a]lthough the Government may be estopped from seeking non-monetary penalties, such as imprisonment, the pursuit of monetary penalties in no way contravenes international law." *Id.*

The Miami RCCL court first addressed whether or not UNCLOS should be accorded the weight of law. 11 F.Supp.2d at 1370. The district court held that it was "not convinced that UNCLOS, a treaty which all parties agree applies to protect navigational freedoms and the law of the sea, has any bearing on this domestic prosecution. The alleged crime occurred in port in Miami, Florida and involved the presentation of a materially false writing to the United States Coast Guard." *Id.* The district court noted that the fact that international issues are implicated is not enough to divest the United States of jurisdiction and that the presentation of a false Oil Record Book seemed more appropriately characterized as a domestic law violation over which the United States properly has jurisdiction. *Id.* at 1371. The court further recognized that the gravamen of the action was not the pollution, not the Oil Record Book violation occurring at that time, but the misrepresentation made while in port. *Id.* As a result, the district court found that the proceeding was not properly characterized as "in respect to a pollution incident" so that UNCLOS, a convention addressing the law of the sea was applicable. *Id.*

*30 The Miami court continued in its analysis, and assumed *agruendo,* that UNCLOS may be raised an a potential issue. *Id.* The court acknowledged that it did appear that UNCLOS is properly considered customary international law. *Id.* at 1372. The district court found no authority for the proposition that customary international law is properly self executing so as to afford RCCL standing to litigate its rights under UNCLOS. *Id.* However, the district court did not need to decide if UNCLOS was self-executing because it found no specific right of private action in UNCLOS that would provide an individual litigant redress under UNCLOS. *Id.* at 1373. Since there was no private right of action, RCCL did not have standing to litigate its rights under UNCLOS. *Id.* Accordingly, the Miami court denied RCCL's motion to dismiss on that ground. *Id.*

By its own terms, Article 230.2, if it does apply, does not prohibit prosecution. It only prohibits non-monetary sanctions. The Government may at some point in time be estopped from attempting to impose non-monetary penalties, but that is an issue to be addressed by the district court at a later date. Therefore, this Court finds that the charges in the Second Superseding Indictment should not be dismissed on this ground.

Additionally, this Court agrees with the analysis of the Miami district court. The crimes alleged in the Second Superseding Indictment allegedly occurred in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the Eastern District of Texas. Like in the Miami case, the issue is not concerning a pollution incident or violation. Although it is alleged that pollution equipment was bypassed and discharges were made, OSG has not been charged with a pollution violation and none is alleged. The charges in this case evolve from Defendant's alleged misrepresentations and omissions contained in the ship's Oil Record Book when it was presented on various occasions in the Eastern District of Texas. It is difficult, at best, to categorize this prosecution as being "in respect to a pollution incident". This Court will follow the direction of Judge Middlebrooks in his Miami RCCL opinion and find that UNCLOS does not divest the Court of jurisdiction and is not applicable.

Although UNCLOS was signed by the United States in 1994 and sent to the United States Senate, it has not been ratified by the Senate and does not have the force of law. *United States v. Best,* 304 F.3d 308, 315 (3rd Cir.2002). In any event, even if the United States were a party to UNCLOS, and it did apply, OSG has no standing to assert rights under the treaty. Treaties are contracts between or among independent nations and, as such, do not create rights that are privately enforceable. *United States v. Jimenez-Nava,* 243 F.3d 192, 195 (5th Cir.2001), *cert. denied* 533 U.S. 962, 121 S.Ct. 2620, 150 L.Ed.2d 773 (2001).

Finally, this Court agrees with the Miami RCCL court that it does appear that UNCLOS is properly considered customary international law. *See also Mayaguezanos por la Salud Y El Ambiente v. United States,* 198 F.3d 297, 304 n. 14 (1st Cir.1999). Even so, this Court also finds that OSG still does not have standing. A violation of international common law does not affect the Court's jurisdiction. *See United States v. Williams,* 617 F.2d 1063, 1090 (5th Cir.1980). In addition, there is no specific right of private action in UNCLOS which would provide the Defendant redress. *See Royal Caribbean Cruises, Ltd.* (Miami RCCL), 11 F.Supp.2d at 1373.

Freedom of Navigation Argument
*31 OSG points out that, during the negotiation of UNCLOS, the United States was concerned regarding the impact of coastal state exercises of jurisdiction which could impact freedom of navigation. OSG argues that, in seeking to prosecute OSG criminally for entering United States ports, the Government is in contravention of freedom of navigation. OSG argues that this freedom of passage or navigation is extremely important and that a coastal state cannot exercise jurisdiction on board a foreign ship passing through the territorial sea except if the crime extends to the coastal state or is a kind which destroys the peace of the country or the good order of the territorial sea.

As mentioned *supra,* any right to complain about a violation of the right of innocent passage belongs to the Marshall Islands, not OSG. OSG has cited no authority which indicates that, based upon principles of freedom of navigation, it is immune from charges such as these, which allegedly occurred in the Eastern District of Texas, or that it has a private right of action.

Are only civil penalties available under APPS?
Title 33, United States Code, Section 1908(a) provides, in part:
(a) Criminal penalties; payment for information leading to conviction
A person who knowingly violates the MARPOL Protocol, Annex IV to the Antarctic Protocol, this chapter, or the regulations issued thereunder commits a class D felony.
Title 33, United States Code, Section 1908(b) also provides, in part:
I. Civil penalties; separate violations; assessment notice; considerations affecting amount; payment for information leading to assessment of penalty

A person who is found by the Secretary, after notice and an opportunity for a hearing, to have
(1) violated the MARPOL Protocol, Annex IV to the Antarctic Protocol, this chapter, or the regulations issued thereunder shall be liable to the United States for a civil penalty, not to exceed $25,000 for each violation; or
(2) made a false, fictitious, or fraudulent statement or representation in any matter in which a statement or representation is required to be made to the Secretary under the MARPOL Protocol, Annex IV to the Antarctic Protocol, this chapter, or the regulations thereunder, shall be liable to the United States for a civil penalty, not to exceed 5000 for each statement or representation.

Defendant argues that the criminal provision of APPS (33 U.S.C. § 1908(a)) fails to expressly criminalize the making of false statements and that false statements are expressly provided for in the civil section of APPS (33 U.S.C. § 1908(b)(2)). Defendant argues that false statements are not included among the acts subject to criminal sanctions under APPS.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The Government responds that the civil and criminal provisions of APPS can be read in harmony. According to the Government, Congress intended that the criminal sanctions of APPS be reserved for the worst types of violations--those committed knowingly. The Government notes that, in contrast, the civil penalty provisions, including the civil infraction for making a false statement, have no *mens rea* requirement and may be imposed without proof of intent. The Government concludes that the availability of the lesser penalties for a lesser offense in no way negates or repeals the availability of criminal; penalties when "knowing" conduct is at issue.

*32 The starting point for interpreting a statute is an examination of the language of the statute itself. *United States v. Kay,* 359 F.3d 738, 742 (5th Cir.2004). When construing a criminal statute, we must follow the plain and unambiguous meaning of the statutory language. *Id.* A statute must, if possible, be construed in such a fashion that *every word* has operative effect. *Id.* (emphasis added). It is a cardinal principle of statutory construction that a statute ought to be construed so that no clause, sentence, or word shall be superfluous, void, or insignificant. *Kaltenbach v. Richards,* 464 F.3d 524, 528 (5th Cir.2006). When a statute's language is plain, the sole function of the courts, at least where the disposition required by the text is not absurd, is to enforce it according to its terms. *Carrieri v. Jobs.com, Inc.,* 393 F.3d 508, 518 (5th Cir.2004).

This Court finds that 33 U.S.C. § 1908(a) unambiguously provides for criminal penalties for knowing violations of the MARPOL Protocol and the corresponding regulations, while Section 1908(b) unambiguously provides for civil penalties which may not have been committed with the requisite intent. Congress' intentional placement of the word "knowingly" in § 1908(a) indicates its desire to apply harsher sanctions to those who knowingly violate pollution laws. Defendant's reading of the statute ignores Congress' requirement of *mens rea* before imposing criminal sanctions. Knowingly made false statements can properly be prosecuted under § 1908(a).

False Statements and Obstruction of Justice
Title 18, United States Code § 1001 provides that "(a) ... whoever ... knowingly and willfully
  (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
  (2) makes any false, fictitious, or fraudulent statement or representation; or
  (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry shall be fined under this title ...

Count 2 of the Second Superseding Indictment alleges that Jho and OSG, on or about September 15, 2005, in Port Neches, Texas, in the Eastern District of Texas:
  "acting through its wholly-owned subsidiaries, agents and employees, who were acting within the scope of their agency and employment, and for the benefit of Defendant OSG, dis knowingly and willfully make and use and cause the making and use of materially false writings and documents, in a matter within the jurisdiction of the U.S. Coast Guard and Department of Homeland Security, to wit, during a U.S. Coast Guard inspection of the *Pacific Ruby* to determine the ship's compliance with United States law, Defendant Jho made and used a false and fictitious Oil Record Book that stated that a discharge had been made on September 11, 2005 "with 15 ppm equipped" and created the overall false and misleading impression, through materially false and misleading entries and omissions, that the vessel was being operated properly, when Defendant Jho knew then and there that the fifteen (15) ppm equipment, namely the Oil Content Meter, was being flushed with fresh water, and was not sensing a true sample of the oily mixture, slops from bilges and bilge water that had accumulated in machinery spaces that were being discharged overboard.
  *33 All in violation of Title 18, United States Code, sections 1001(a)(3) and (2)."

According to OSG, the Government does not allege that any illegal discharge occurred in United States territorial waters. OSG contends that the Government has exceeded the jurisdictional limits of APPS in that the actual entries into the log, "while the vessel was outside the territorial waters of the United States", was not within the purview of the United States Government's jurisdiction

Again, we look to the Miami district court's opinion in *United States v. Royal Caribbean Cruises, Ltd,* for guidance on this issue. RCCL argued that since the Government had no authority to regulate conduct occurring outside the navigable waters of the United States, the Oil Record Book and its entries or lack thereof were not within the jurisdiction of the United

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

States, much less the United States Coast Guard. *Id.* at 1362.

The Miami district court noted that the United States Supreme Court stated that jurisdiction within the meaning of section 1001 should not be narrowly or technically defined. *Id.* (Citing *United States v. Herring*, 916 F.2d 1543, 1547 (11th Cir.1990), *cert. denied* 500 U.S. 946, 111 S.Ct. 2248, 114 L.Ed.2d 488 (citing *United States v. Rogers*, 466 U.S. 475, 480, 104 S.Ct. 1942, 1946, 80 L.Ed.2d 492 (1984))). "Under the law as developed in the Eleventh Circuit, the fact that the alleged statement in a § 1001 case was not within the jurisdictional bounds of the United States is not fatal to the claim." *Id.* (Citing *United States v. Cox*, 696 F.2d 1294 (11th Cir.1983) (upholding conviction for § 1001 violation where relevant documents were filled out in Guatemala). The Miami district court concluded that whether or not the United States has the authority to regulate the unauthorized discharge at the time it occurred did not bear on the court's inquiry as to whether the United States had jurisdiction to enforce its laws in an American port regarding the commission of false statements made to a United States agency performing its proper duties. *Id.* at 1364.

In *Bryson v. United States* [FN3], the Supreme Court stated that the term " 'jurisdiction' should not be given a narrow or technical meaning for purposes of § 1001." The Coast Guard is authorized to conduct inspections of vessels to determine compliance with MARPOL, APPS, and related regulations, and is specifically authorized to examine a vessel's Oil Record Book pursuant to 33 C.F.R. Sections 151.23(a)(3) & (c). These inspections are regularly conducted activities of the Coast Guard. Defendant has cited no authority which suggests that the United States has no jurisdiction over false statements made in port concerning discharges made at sea which may be beyond the United States' jurisdiction to regulate. This Court agrees that "[t]o find the contrary would raise serious questions about the government's ability to enforce, as a matter of domestic law, false statements made in connection with such matters as bank fraud, immigration, and visa cases, where the statements at issue were made outside of the United States, perhaps acceptable or in the alternative unnecessary under the appropriate foreign regulatory scheme, but nonetheless illegal under United States law." *Royal Caribbean Cruises, Ltd.*, 11 F.Supp.2d at 1364.

*\*34* In addition, an alternate basis for jurisdiction exists. Jurisdiction of the United States embraces offenses which have an effect within its sovereign territory, even though the acts constituting the offense occurred outside of the United States. *United States v. Williams*, 617 F.2d 1063, 1076 (5th Cir.1980) (en banc). Presentation of a false Oil Record Book to Coast Guard officials conducting an inspection pursuant to United States' laws and regulations certainly has an effect within the sovereign territory. *Royal Caribbean Cruises, Ltd.*, 11 F.Supp.2d at 1364.

Secondly, OSG argues that the statements in the Oil Record Book could not have been material because the Coast Guard could not have been affected by any statement relating to activities on the high seas over which they did not have jurisdiction. As discussed above, this Court finds that whether the United States has the authority to regulate the unauthorized discharge at the time it occurred does not bear on the instant inquiry as to whether the United States has jurisdiction to enforce its laws in a United States port regarding the commission of false statements made to a United States agency performing its proper duties.

A material statement is one that has a natural tendency to influence, or one that is capable of affecting or influencing a government function. *United States v. Puente*, 982 F.2d 156, 159 (5th Cir.1993), *cert. denied* 508 U.S. 92 (1993). Actual influence or reliance by a government agency is not required. *Id.* The statement may be material even if it is ignored or never read by the agency receiving the misstatement. *Id.* In determining whether an indictment sufficiently alleges materiality the Court looks to whether the statement or representation alleged to be false could conceivable have a tendency or capacity to influence or affect a government function; that is, whether it is potentially capable of being proved material by the government at trial. *United States v. McGough*, 510 F.2d 598, 602 (5th Cir.1975). If the facts alleged in the indictment warrant an inference that the false statement is material, the indictment if not fatally insufficient for its failure to allege materiality *haec verba*. *Id.*

The Coast Guard is specifically authorized to board a ship to determine whether the vessel has discharged any oil or oily mixtures on violation of MARPOL and the Coast Guard officers are entitled to inspect the Oil Record Book, Oil Content Meter, and other equipment on the vessel. *See* 33 C.F.R. § 151.23(a)(3) & (c). The alleged statements and omissions, in an Oil Record Book which the Coast

Guard has the lawful authority to inspect, would have a natural tendency to influence, or be capable of affecting or influencing the Coast Guard's mission of investigating violations of MARPOL, APPS, and other federal regulations concerning pollution of the seas and waterways.

OSG notes that Regulation 9(4) of Annex I of MARPOL provides that the use of the pollution equipment does not apply to the discharge of mixtures which have an oil content below 15 ppm. It further argues that the Government does not allege that the discharges at issue contained more than 15 ppm oil and that, therefore, any statement about those discharges were not material. In its response, the Government contends that Jho made entries in the Oil Record Book that discharges were made "with" or "through" 15 ppm equipment when he knew the equipment was being "tricked" and was not in operation. The Government notes that without the use of the monitoring equipment, it is not known exactly how much oil pollution was discharged be the defendants.

*35 Simply put, the regulations require that the oil pollution equipment be in operation. It is a material misrepresentation (at least one for a jury to consider) to falsely indicate that pollution equipment on an oil tanker is properly working when, in fact, it had been disabled. APPS and MARPOL are in place to ensure that ships properly monitor the discharge of oily mixtures which are discharged overboard. It would be a material misrepresentation if it were alleged that defendants discharged mixtures which contained oil over the 15 ppm level, knowing that it contained a greater amount. Certainly "tricking" the equipment and making notations that the equipment was in operation would be a material misrepresentation, again, at least for a jury to consider.

Lastly, OSG argues that no reasonable jury would find beyond a reasonable doubt that it had the specific intent to deceive officials of the Coast Guard or that they acted with the intent to impede, obstruct, or influence an investigation or proper administration of any matter when the log book was inspected on September 15, 2005. This Court cannot foresee what evidence will be presented by the Government to the jury regarding the issue of intent. On a motion to dismiss an indictment, the court is only to consider those objections which are capable of determination without the trial of the general issue; evidentiary or factual questions should not be determined at this stage. *See United States v. Knox,* 396 U.S. 77, 90 S.Ct. 363, 24 L.Ed.2d 275 (1969).

Conclusion

Accordingly, based upon the reasoning set forth herein, the undersigned United States Magistrate recommends that the District Court deny *Defendant Overseas Shipholding Group, Inc's Motion to Dismiss Second Superseding Indictment* [Clerk's doc. # 59].

Objections

Pursuant to 28 U.S.C. § 636(b)(1)(c), all parties are entitled to serve and file written objections to the report and recommendation of the magistrate judge within ten (10) days of receipt of this report. Failure to file specific, written objections to the proposed findings of facts, conclusions of law and recommendations contained within this report within ten (10) days after service shall bar an aggrieved party from *de novo* review by the District Judge of the proposed findings, conclusions and recommendations, and from appellate review of factual findings and legal conclusions accepted by the District Court except on grounds of plain error. *See Thomas v. Arn,* 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Douglass v. United Serv. Auto. Ass'n,* 79 F.3d 1415 (5th Cir.1996) (*en banc* ); 28 U.S.C. § 636(b)(1). The constitutional safeguards afforded by Congress and the courts require that, when a party takes advantage of his right to object to a magistrate's findings or recommendation, a district judge must exercise its nondelegable authority by considering the actual evidence and not merely by reviewing and blindly adopting the magistrate's report and recommendation. *See Hernandez v. Estelle,* 711 F.2d 619, 620 (5th Cir.1983); *United States v. Elsoffer,* 644 F.2d 357, 359 (5th Cir.1981) (per curiam).

FN1. Collectively referred to as the MARPOL Protocol, the two treaties APPS codifies are the 1973 INTERNATIONAL CONVENTION FOR THE PREVENTION OF POLLUTION FROM SHIPS and the PROTOCOL OF 1978 RELATING TO THE INTERNATIONAL CONVENTION FOR THE PREVENTION OF POLLUTION FROM SHIPS. These treaties were negotiated by member nations of the International Maritime Organization (IMO), a mutilateral body formed in 1948.

FN2. Although it is not necessary for the Court to reach this point, it is worth noting that Captain Jho--as the cheief enginener but

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

not the master of the *Pacific Ruby*--is not even the person required by the Coast Guard regulations to maintain the oil record book. 33 C.F.R. § 151.25(j).

FN1. The facts are taken from the *Second Superseding Indictment* [Clerk's doc. # 46] on file in this matter.

FN2. The Government points out that each count of the Second Superseding Indictment alleges a crime which occurred within the Eastern District of Texas and Jho has cited no authority for the proposition which supports dismissal for the alleged crimes of conspiracy, making false statements, or failing to maintain an Oil Record Book while in a United States port.

FN3. Royal Caribbean Cruises, Ltd. (RCCL) owned and operated the *Sovereign of the Seas* and the ship flies the flag of Norway.

FN4. Count One of the indictment charged RCCL and a crew member with conspiracy to discharge oil into the navigable waters of the United States in violation of 33 U.S.C. § 1319(c) and § 1321(b)(3). Count One also charged RCCL and a crew member with conspiracy to use false writings in violation of 18 U.S.C. § 1001. Count Two charged RCCL with knowingly discharging a harmful quantity of oil into the navigable waters of the United States in violation of 33 U.S.C. § 1319(c)(2)(A) and § 1321(b)(3). Count Three charged RCCL with a failure to report harmful discharges to the appropriate United States agency in violation of 33 U.S.C. § 1321(b)(5). Count Four charged RCCL with using a false writing to make a false statement to the Coast Guard in the form of a falsified Oil Record Book representing that no discharges of contaminated bilge waste were made without the use of the Oil Water Separator in violation of 18 U.S.C. § 1001. Count Five charged RCCL and a crew member with making false statements to a Coast Guard official in violation of 18 U.S.C. § 1001. Count Six charged RCCL and a crew member with making false statements to a Coast Guard official in violation of 18 U.S.C. § 1001, by stating that the Oil Water Separator was working properly when it was not. Counts Seven and Eight charged RCCL and a crew member with witness tampering in violation of 18 U.S.C. § 1512(b)(3) and § 1512(b)(1). Count Nine charged RCCL and a crew member with witness tampering in violation of 18 U.S.C. § 1512(b)(1). Finally, Count Ten charged RCCL and a crew member with obstruction of justice in violation of 18 U.S.C. § 1512(b)(2)(B). *Royal Caribbean Cruises, Ltd.*, 24 F.Supp.2d at 158.

FN5. The Indictment alleged that the Oil Record Book falsely represented that all overboard discharges of oil contaminated bilge occurred only after treatment of the bilge waste through 15 parts per million equipment, that is, the Oil Water Separator, and which failed to record the overboard discharge of oil contaminated bilge waste without the use of the Oil Water Separator. *Id.* at 1362.

FN6. RCCL argued that this prosecution violated the international equivalent of a double jeopardy prohibition contained in UNCLOS Article 228, the statute of limitations provision of Article 228.2, and the prohibition from initiating a prosecution absent a request from the flag state or the state damaged or threatened by the discharge violation set forth in Article 218.2. *Id.* at 1362.

FN7. *See* 18 U.S.C. § 1350

FN8. Dana E. Hill, author; 90 CORNELL L. REV. 1519 (2004).

FN9. Section 1519 contains a *mens rea* requirement in that it requires that the defendant act *knowingly* with the *intent* to obstruct justice.

FN10. 11 F.Supp.2d 1358 (S.D.Fla.1998)

FN11. 396 U.S. 64, 70, 90 S.Ct. 355, 359, 24 L.Ed.2d 264 (1969).

FN12. Defendant is correct that the regulations do not specifically require that an entry be placed in the Oil Record Book to indicate that the system was "tricked" and flushed with fresh water. Drafters of the regulations could not conceive each and every way that someone may illegally tamper with oil pollution equipment on an oil tanker. The regulations do require an entry in the case of failure of the equipment and when there is an exceptional discharge. *See* MARPOL, Annex I, Appendix III(F); 33 C.F.R. § 151.25(g).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN1. The facts are taken from the *Second Superseding Indictment* [Clerk's doc. # 46] on file in this matter.

FN2. The Government points out that each count of the Second Superseding Indictment alleges a crime which occurred within the Eastern District of Texas and contends that defendants have cited no authority for the proposition which supports dismissal for the alleged crimes of conspiracy, making false statements, or failing to maintain an Oil Record Book while in a United States port.

FN3. 396 U.S. 64, 70, 90 S.Ct. 355, 359, 24 L.Ed.2d 264 (1969).

--- F.Supp.2d ----, 2006 WL 3488952 (E.D.Tex.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.